IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| POTOMAC AUTO MALL HOLDINGS, INC., ) <br> ) <br> *Plaintiff*, ) <br> ) <br> v. ) <br> ) <br> BLUE CLOVER FINANCIAL, LLC, *et al.*, ) <br> ) <br> *Defendants*. ) | Case No. 1:20-cv-865 <br> Hon. Liam O'Grady |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendants' Rule 12(b)(2) motion to dismiss Plaintiff's complaint (Dkt. 1) for lack of personal jurisdiction. *See* Dkt. 22. For the reasons set forth below, Defendants' motion is **DENIED**.

### I. BACKGROUND

#### a. The parties

Plaintiff Potomac Auto Mall Holdings, Inc. ("Plaintiff") is a limited liability company based in Virginia and wholly owned by Jason Brown, a citizen of Virginia. Dkt. 1, at 2, ¶¶ 4–5. Defendant Blue Clover Financial LLC ("Blue Clover") is a limited liability company with its principal place of business in Florida. *Id.* ¶ 7. Defendant Anthony Ricciardo ("Ricciardo"), a citizen of Florida, is the principal and controlling member of Blue Clover. *See id.* ¶¶ 8–10.

#### b. The parties' dealings

Plaintiff endeavored to "purchase and develop real property in Virginia" from a buyer, Guy Travers ("Travers"). *Id.* at 3–4, ¶¶ 14, 25. Ricciardo learned of Plaintiff's endeavor through a mutual acquaintance, and initiated contact with Plaintiff by phone during January 2018 to solicit his business. Dkt. 27-1, at 1. Specifically, Ricciardo offered to finance Plaintiff's

purchase of the Travers property. *Id.* The parties subsequently negotiated and ratified a non-binding "Term Sheet" on February 28, 2018 that set forth tentative loan terms. *Id.* at 4–9. Plaintiff executed the Term Sheet from its office in Prince William County, Virginia. To enable Defendants to secure funding for the loan pursuant to the Term Sheet, Plaintiff wired $25,000 to them on February 28, 2018. Dkt. 27-1

The provisions in the Term Sheet were later incorporated into a Lender Commitment Letter that was signed by Plaintiff on January 14, 2019. Dkt. 1-2, at 6. The parties agreed in the Lender Commitment Letter that Blue Clover would loan Plaintiff the funds to purchase the Travers property. Dkt. 1-1. When the property deal between Plaintiff and Travers closed, the terms of the Lender Commitment Letter were set to merge into a $22,050,440.28 Loan and Security Agreement, which was pre-drafted. *Id.* at 2, ¶ 15 n.1.

With financing apparently secured, Plaintiff moved forward with efforts to close on its purchase of the Travers property. *See id.* ¶ 18. Unfortunately for Plaintiff, funding was not, in fact, secured. Over a six-month period between October 2019 and March 2020, Defendants subjected Plaintiff to a proverbial run-around that is best presented chronologically:

- Initially, Plaintiff was scheduled to close on the Travers property on October 21, 2019. *Id.* ¶ 17. Right before closing, Defendants advised Plaintiff that "Blue Clover could not close on that date and rescheduled the closing to occur on November 5, 2019. *Id.*
- On November 4, 2019, Plaintiff emailed Ricciardo to confirm that Blue Clover was on track to close the next day. *Id.* ¶ 18. Ricciardo did not respond. *Id.*
- On November 5, 2019, Plaintiff emailed Ricciardo again, seeking an update. *Id.* Again, Ricciardo did not respond. *See id.* at 4, ¶ 20.
- On November 7, 2019, Plaintiff emailed Ricciardo again, warning him that Blue Clover's "no show" was subjecting Plaintiff to legal risk. *Id.* at 3–4, ¶ 19. Again, Ricciardo did not respond. *See id.* at 4, ¶ 20.
- On November 8, 2019, an agent of Blue Clover finally responded, notifying Plaintiff that Blue Clover was "close" to closing. *Id.*
- On November 13, 2019, Plaintiff spoke with Ricciardo by phone. *Id.* ¶ 21.

2

- On November 15, 2019, Plaintiff followed up on the November 13, 2019 phone call with an email that sought clarification from Ricciardo on Blue Clover's position. *Id.*
- On November 19, 2019, Plaintiff spoke with Ricciardo by phone. *Id.* ¶ 22. Ricciardo assured Plaintiff that the funds were available and that closing "would take place imminently." *Id.*
- On November 21, 2019, Ricciardo doubled back, informing Plaintiff that Blue Clover "had a delay in [the] availability of funds that is causing [it] to not be able to fund this Friday. We expect to have funds available in the next 14 calendar days." *Id.* ¶ 23.
- On November 22, 2019, Ricciardo contacted Travers, the seller, asking for an extension to the closing date. *Id.* at 4–5, ¶ 25. In this email, Ricciardo explained that Blue Clover "expect[ed] to have funds available in the next 14 calendar days." *Id.*
- On November 30, 2019, Plaintiff emailed Ricciardo asking about "the financing that was to take place in the 'next 14 calendar days.'" *Id.* at 5, ¶ 27. Ricciardo "did not respond until December 2, 2019," at which point he provided no material update. *Id.*
- On December 5, 2019, counsel for Blue Clover emailed Plaintiff, confirming that Clover had "the clearance to close this loan next Wednesday." *Id.* ¶ 29. Based on this information, the closing was rescheduled for December 11, 2019. *Id.* at ¶ 30.
- December 11, 2019 came and went, and Blue Clover again failed to deliver financing. *Id.* at 6, ¶ 31.
- On December 15, 2019, Plaintiff emailed Ricciardo, asking for a status update. *Id.* ¶ 33. He again received no response. *Id.*
- On December 31, 2019, Plaintiff again followed up by email. *Id.* at ¶ 34.
- On January 7, 2020, Ricciardo finally responded to Plaintiff to advise him that Clover "won't have the ability to close on any projects until the end of February." *Id.* at ¶ 35.
- February came and went, and no funding was ever made available to Plaintiff. *Id.* at 7, ¶ 36. Plaintiff, at all times, was "willing and able" to close in full compliance with the terms of the Commitment Letter." *Id.* ¶ 37.

Over the course of the parties' dealings and communications, Plaintiff estimates that it made "well over one hundred (100) telephone calls" to Ricciardo and other agents of Blue Clover. Dkt. 27-1, at 2. Plaintiff attests that "[e]ach of these phone calls was made or received while [Plaintiff] was present in Virginia." *Id.* Plaintiff also attests that "there were hundreds of emails exchanged" between Plaintiff and the Defendants, all of which were sent or received while Plaintiff was present in Virginia. *Id.* Finally, Plaintiff states that he was obligated to make loan payments pursuant to the Commitment Letter and Term Sheet, and that these payments were "to

3

be made from Virginia." *Id.* This reaffirms what is clear from the complaint: that the dealings and communications between Plaintiff and the Defendants were calculated to culminate in Plaintiff's purchase and development of property in Virginia. *Id.* at 3.

### c. Procedural history

On July 28, 2020, Plaintiff filed a complaint against Defendants in this Court, asserting breach of contract, unjust enrichment, fraudulent misrepresentation, negligent misrepresentation, and tortious interference with contract under Virginia law. *See* Dkt. 1. The Court has proper subject matter jurisdiction over the case, as there exists complete diversity between the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

## II. LEGAL STANDARD

Rule 12(b)(2) authorizes dismissal of an action where the court lacks personal jurisdiction. Fed. R. Civ. P 12(b)(2); *see also Henderson v. Fairfax-Falls Church Community Serv. Bd.*, 2018 WL 6037522, at *2 (E.D. Va. Nov. 15, 2018), *aff'd sub nom.* 771 F. App'x 205 (4th Cir. 2019) ("An entity that does not have capacity to be sued is outside the personal jurisdiction of the court."). When a defendant challenges a court's personal jurisdiction on a Rule 12(b)(2) motion, "the jurisdictional question thus raised is one for the judge, with the burden on the Plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). The Court, in resolving this "jurisdictional question," "must construe all relevant . . . allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.*; *see also Human Res. Certification Inst. v. Human Res. Prof'l Ass'n*, 453 F. App'x 349, 350 (4th Cir. 2011). In doing so, the Court may consider pleadings, affidavits, motion papers, and supporting legal memoranda, *see Combs*, 886

F.2d at 676, as well as "evidence outside the pleadings," *Structural Pres. Sys., LLC v. Andrews*, 931 F. Supp. 2d 667, 671 (D. Md. 2013).

### III. DISCUSSION

On a Rule 12(b)(2) motion, the Court undertakes a two-step process: it first looks to whether personal jurisdiction is authorized by state law and then analyzes whether exercising personal jurisdiction comports with limits of constitutional due process. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). This two-step process is well established. *See, e.g., Ellicott Mach. Corp. v. John Holland Party, Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993); *Blue Ridge Bank v. Veribanc, Inc.*, 755 F.2d 371, 373 (4th Cir.1985); *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir. 1982).

The Fourth Circuit and the Virginia Supreme Court have made clear that Virginia's long-arm statute, at a minimum, extends personal jurisdiction to the limits permitted by constitutional due process. *See, e.g., Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004); *Brown v. American Broadcasting Co., Inc.*, 704 F.2d 1296, 1301 (4th Cir. 1983); *Peanut Corp. of Am.*, 696 F.2d at 313; *John G. Kolbe, Inc. v. Chromodern Chair Co.*, 180 S.E.2d 664 (Va. 1971) ("It is manifest that the purpose of Virginia's long arm statute is to assert jurisdiction over nonresidents who engage in some purposeful activity in this State to the extent permissible under the Due Process Clause."). However, it is "equally well-settled . . . that Virginia's long-arm statute must be satisfied even in those situations where it could plausibly be argued that a lesser standard would meet due process." *See Haskins v. Washington Adventist Hosp.*, 2012 WL 92360, at *2 (E.D. Va. Jan. 11, 2012) (citing *Robinson v. Egnor*, 699 F. Supp. 1207, 1211 (E.D. Va. 1988)). Thus, Virginia's long-arm statute, Va. Code § 8.01-328.1, imposes personal jurisdiction requirements beyond those afforded by the federal constitution; it "provides a ceiling of procedural protections

5

above the federal floor of constitutional due process." *See DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419, 423 (E.D. Va. 1996) (Ellis, J.). So long as that ceiling is reached, the "statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 176 (4th Cir. 2002).

Accordingly, Va. Code. § 8.01-328.1 overlays the constitutional personal jurisdiction inquiry. Its provisions go to whether "the defendant [has] purposefully established 'minimum contacts' in the forum state'" *Asahi Metal Indus. v. Superior Court of Cal.*, 480 U.S. 102, 108–09 (1987) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)), "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Where, as here, a non-resident Defendant's contacts with Virginia form the basis of a suit, *Human Res. Certification Inst.*, 453 Fed. App'x at 350, Va. Code § 8.01-328.1 provides several avenues to evaluate "specific" personal jurisdiction based on

> (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be reasonable.

*See, e.g., Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002).

Plaintiff asserts that Defendants' conduct, through the course of the parties' dealings, supplies the Court with a basis to exercise personal jurisdiction over Blue Clover and Ricciardo. Dkt. 27. Specifically, it insists that the Court may exercise personal jurisdiction over Defendants because Defendants have transacted business in Virginia. *See* Va. Code. § 8.01-328.1(A)(1). The Plaintiff also states that the Court's exercise of personal jurisdiction over Defendants

6

pursuant to Va. Code § 8.01-328.1(A)(1) does not violate constitutional due process. *See* Dkt. 27, at 13. The Court agrees.[1]

### a. Virginia's long-arm statute

In determining whether Va. Code § 8.01-328.1(A)(1) authorizes personal jurisdiction, courts examine "both the quantity and quality of [Defendants'] contacts." *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 761 F. Supp. 423, 426 (E.D. Va. 1991). This involves a detailed inquiry into "(1) where any contracting occurred, and where the negotiations took place, (2) who initiated the contact, (3) the extent of the communications, both telephonic and written, between the parties, and (4) where the obligations of the parties under the contract were to be performed." *Delta-T Corp. v. Pac. Ethanol, Inc.*, 2009 WL 77869, at *3 (E.D. Va. Jan. 7, 2009); *Affinity Memory and Micro. Inc. v. K&Q Enterprises*, 20 F. Supp. 2d 948, 952 (E.D. Va. 1998) (same).

Based on these factors, the Court does not hesitate to find that Defendants' conduct satisfies Virginia's long-arm statute. The case at bar mirrors an enduring line of cases in this Circuit in which courts have found contracting activity like the kind undertaken by the Defendants to give rise to personal jurisdiction. The genesis of this line of cases, *Peanut Corporation of America v. Hollywood Brands, Inc.*, involves facts analogous to this case. In *Peanut Corporation*, the Fourth Circuit explained:

> Although [Defendant] argues that it had no contacts with Virginia concerning the disputed contract, the modification letter, which became a part of the basic contract was addressed to and received by [Plaintiff] in Virginia, telephonic negotiations occurred with one of the participants located in Virginia, and numerous written communiques between the parties were sent to and received in Virginia. There was sufficient "contracting" in Virginia to amount to the transaction of business from which the cause of action arose.

---

[1] Because the Court finds that the Defendants' conduct meets the requirements of Va. Code § 8.01-328.1(A)(1), it need not consider whether Va. Code § 8.01-328.1(A)(4) also applies.

7

696 F.2d at 314. Similarly, in *English & Smith v. Metzger*, the Fourth Circuit observed:

> [The out-of-state Defendant] initiated the relationship with [Plaintiff], knowing that [Plaintiff] was a Virginia lawyer who likely would do the requested work in Virginia. [Defendant] contracted with [Plaintiff] in Virginia, first by telephone and later in a writing that [Plaintiff], as the last party to sign, executed in Virginia. [Plaintiff] performed all of his duties under the contract in Virginia. Finally, the parties exchanged numerous telephone calls and written communications. . . . Because [Defendant] transacted business in Virginia, and because [Plaintiff's] cause of action arose directly from those activities, the Virginia long-arm statute is satisfied.

901 F.2d 36, 39 (4th Cir. 1990). The list goes on. *See, e.g., Holland v. Hay*, 840 F. Supp. 1091, 1096 (E.D. Va. 1994) (Smith, C.J.); *Altimari v. Beverage Mktg. USA, Inc.*, 2008 WL 9396601, at *4 (E.D. Va. Nov. 21, 2008) (Jackson, J.).

Like the Defendants in these cases, Defendants Blue Clover and Ricciardo deliberately reached into Virginia to solicit business from a Virginia-based Plaintiff. Dkt. 27-1, at 1. Specifically, Defendants' sought to finance Plaintiff's purchase and development of property in Virginia. Dkt. 1-1, at 1. The parties' agreement contemplated partial performance of the loan agreement in Virginia, *see* Dkt. 1-2, at 1, and it was ratified, in part, in Virginia. *See* Dkt. 27-1, at 2. Virginia property collateralized Defendants' loan. Dkt. 27, at 7. And when the Defendants failed to timely deliver financing, they independently contacted the third-party seller, also located in Virginia, to salvage the sale. *Id.* The parties exchanged money to and from Virginia pursuant to their Term Sheet. Dkt 27-1, at 2, 10. And throughout the course of their dealings, Defendants communicated with Plaintiff "hundreds of times" by phone and by email while Plaintiff was in Virginia. *Id.* at 2. Based on the foregoing, the Court finds, by a preponderance of the evidence, that Virginia's long-arm statute authorizes personal jurisdiction over both

8

Defendants based on their transaction of business in the commonwealth. *See* Va. Code § 8.01-328.1(A)(1).[2]

Defendants object to the Court's exercise of personal jurisdiction over Ricciardo in his individual capacity. This argument is without merit. Though "contacts of a company" may not be "attributed to an agent for jurisdictional purposes" based solely on their status as corporate officers, Dkt. 23, at 9, "corporate officers *are* subject to personal jurisdiction if they have 'sufficient contacts with Virginia, even if those contacts [are] made ostensibly on behalf of' their corporation." *See Thousand Oaks Barrel Co., LLC v. Deep S. Barrels LLC*, 241 F. Supp. 3d 708, 718 (E.D. Va. 2017) (citing *ePlus Technology, Inc. v. Aboud*, 313 F.3d 166, 177 (4th Cir. 2002)) (emphasis added). These contacts are "judged separately from those of the company" for purposes of determining personal jurisdiction. *See Noble Sec.*, 611 F. Supp. 2d at 527.

Defendants' assertion that "[t]he Complaint fails to set forth any facts that support the contention that Mr. Ricciardo himself had contacts with the Commonwealth of Virginia, which gave rise to the complaint" is completely untenable. The complaint details Ricciardo's numerous alleged misrepresentations, communication of anticipatory breach to Plaintiff on January 7,

---

[2] The cases Defendants cite in support of their argument that no personal jurisdiction exists under Va. Code § 8.01-328.1(A)(1) are unpersuasive. As explained, the record indicates that the Lender Commitment Letter was ratified, in part, in Virginia, and that the Loan and Security Agreement was to be performed, in part, in Virginia. *See* Dkt. 27-1, at 2. Thus, the Defendants' assertion that Virginia's long-arm statute "does not extend to a contract formed and performed outside Virginia" is unavailing. *See* Dkt. 23, at 5 (citing *Noble Sec., Inc. v. MIZ Eng'g, Ltd.*, 611 F. Supp. 2d 513, 530 (E.D. Va. 2009)). Defendants also rely on *Initiatives Inc. v. Korea Trading Corporation* for the sweeping generalization that "contracts between . . . parties [are] insufficient to establish specific jurisdiction." *See* 991 F. Supp. 476, 479 (E.D. Va. 1997). But none of the contracts at issue in *Initiatives Inc.* were due to be performed in Virginia, and so that case is also inapplicable. *See* Dkt. 27, at 12. Finally, Defendants appear to suggest that their transaction with Plaintiff was insignificant and "contrived." *See* Dkt. 29, at 3. That claim finds no support in the record.

9

2020, and intervening contacts with the third-party seller, Travers. *See* Dkt. 1, at 3–7. If there was any doubt, the Plaintiff "puts extra icing on a cake already frosted"[3] by detailing Ricciardo's unsolicited outreach to Plaintiff in January 2018 when Ricciardo was informed of Plaintiff's Virginia venture by a mutual acquaintance. *See* Dkt. 27-1, at 1. Courts in the Fourth Circuit heavily weigh this form of deliberate initiation of contacts with a Plaintiff in a forum state when evaluating personal jurisdiction. *See, e.g., English & Smith*, 901 F.2d at 39; *Affinity Memory & Micro*, 20 F. Supp. 2d at 952; *Delta-T*, 2009 WL 77869, at *3.

In sum, even if Ricciardo qualifies as Blue Clover's "agent" and not its "principal," his minimum contacts with Virginia are more than sufficient to satisfy Virginia's long-arm statute. *See* Va. Code § 8.01-328.1(A)(1). It does not matter that "Ricciardo, as an individual, has never traveled to Virginia," nor does it matter that he "does not own any property, assets, or financial accounts in Virginia." *See* Dkt. 23, at 10. The Court may exercise personal jurisdiction over him regardless. *See Prod. Grp. Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 793 (E.D. Va. 2004) (citing *Peanut Corp. of Am.*, 696 F.2d at 314).

### b. The Defendants' personal jurisdiction under the Due Process Clause

Because Virginia's long-arm statute is satisfied, it follows *a fortiori* that subjecting Defendants to this Court's jurisdiction comports with the Due Process Clause's requirements. *See ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 176 (4th Cir. 2002). Still, the Court writes separately to observe that its exercise of personal jurisdiction over Defendants is constitutionally valid.

As explained above, federal courts in the Fourth Circuit employ a three-prong test to determine whether exercising specific personal jurisdiction over a Defendant satisfies the Due

---

[3] *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J.) (dissenting),

Process Clause. This test looks to "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Universal Leather, LLC*, 773 F.3d at 559.

The purposeful availment prong centers on the "traditional due process concept of "'minimum contacts,' which itself is based on the premise that 'a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there.'" *Id.* (citing *Tire Eng'g v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir.2012)). The inquiry is a flexible one, and considers, *inter alia*,

- (1) whether the defendant maintains offices or agents in the forum state;
- (2) whether the defendant owns property in the forum state;
- (3) whether the defendant reached into the forum state to solicit or initiate business;
- (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state;
- (5) whether the parties contractually agreed that the law of the forum state would govern disputes;
- (6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;
- (7) the nature, quality and extent of the parties' communications about the business being transacted; and
- (8) whether the performance of contractual duties was to occur within the forum.

*Consulting Eng'rs Corp.*, 561 F.3d at 278 (citations and internal quotation marks omitted). Taking these factors into account and considering the "extent, nature, and quality" of Defendants' contacts with Virginia, *Consulting Eng'rs Corp*, 561 F.3d at 281, the Court finds that Defendants purposefully availed themselves of the benefits of the commonwealth's legal protections, such that Defendants incurred "the reciprocal obligation of answering to legal proceedings" in Virginia. *Tire Eng'g*, 682 F.3d at 301. Though Defendants lack a physical footprint in Virginia, they reached into Virginia to solicit Plaintiff's business. *See* Dkt. 27-1, at 1. The scope of the parties' contemplated business dealings was significant; their loan to

11

Plaintiff was valued at $22,050,440, Dkt. 1, at 3, and Plaintiff owed Defendant a "14% fixed interest rate to be paid on a monthly basis," Dkt. 1-1, at 1, as well as a loan origination fee worth 4% of the total loan amount, payable on closing. *See id.* Further, performance of Defendants' contractual duties was due to occur in Virginia, and communications between the Defendants and the parties and non-parties based in Virginia were extensive and continuous. Accordingly, the Court finds sufficient minimum contacts to constitute purposeful availment.

Considering the second prong, the Court has no doubt that the causes of action asserted against Defendants stem from the minimum contacts discussed above. This "genesis of the dispute" requirement is easily satisfied. *Tire Eng'g*, 682 F.3d at 303.

Finally, there is no evidence to suggest that litigation will be "so gravely difficult and inconvenient" for Defendants as to place them at a "severe disadvantage in comparison to [their] opponent." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 296 (4th Cir. 2009). The Defendants have already successfully secured counsel to represent their interests and face no obstacles that would undermine the fairness of the proceedings. Accordingly, the Court finds that the exercise of personal jurisdiction over Blue Clover and Ricciardo is constitutionally reasonable.

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. Dkt. 22.

It is **SO ORDERED.**

November 24, 2020
Alexandria, Virginia

Liam O'Grady
United States District Judge